IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Milo Earl Tudor, Jr., #243378, | ) | C/A No.: 2:98-1927-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael Moore, Director of SCDC; | ) | |
| Doug Catoe, Assistant Director of | ) | |
| SCDC; Rickie Harrison, Warden of | ) | **O R D E R** |
| Kershaw Correctional Institution; | ) | |
| Stann Burtt, Associate Warden of | ) | |
| Kershaw Correctional Institution; | ) | |
| and Robin Chavis, Associate | ) | |
| Warden of Kershaw Correctional | ) | |
| Institution, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This action was originally instituted pro se by the plaintiff, Milo Earl Tudor, Jr., ("Tudor")

pursuant to 42 U.S.C. § 1983, against officials of the South Carolina Department of Corrections seeking

equitable relief in the form of an order that he be housed in a unit free of environmental tobacco smoke

("ETS"), and seeking damages for allegedly exposing him to an unreasonable health risk. The plaintiff

asserts he has been diagnosed with asthma, and that his condition requires frequent treatment. He

claims that his ongoing exposure to unreasonably high levels of ETS has: increased his dependence on

a prescription Albuterol Inhaler, caused him severe asthma attacks on several occasions, and caused him

chronic discomfort and sickness. The plaintiff alleges in his complaint that his exposure to ETS in the

Magnolia East Wing of Kershaw Correctional Institution, and his increasing use of and dependence

upon the Albuterol Inhaler, poses a severe health risk. Specifically, the plaintiff states in his complaint

that "the defendants, did with deliberate indifference/cruel and unusual punishment with malice, and

aforethought expose plaintiff to levels of environmental tobacco smoke (ETS) that is posing (sic) an unreasonable, serious risk to plaintiff's present, and future health."

During this litigation the plaintiff made the same allegations pertaining to his exposure to ETS in the McCormick Correctional Institute where he was transferred to in November, 2001.

The procedural history of this case is quite long, therefore, this court will only set forth such information which is pertinent to this Order. After the complaint was filed, in accordance with the court's order of reference, 28 U.S.C. § 636(b) and Local Rule 73.02(B)(2)(d) (D.S.C.), this case was referred to United States Magistrate Judge Robert S. Carr for pre-trial proceedings. The defendants filed a motion for summary judgment on September 10, 1999. The plaintiff also filed a motion for summary judgment on September 27, 1999. The Magistrate Judge issued a Report and Recommendation analyzing the parties' position on January 24, 2000, and recommended that the defendants' and the plaintiff's motions be denied on the grounds that there were genuine issues of material fact making summary judgment inappropriate. Objections were filed, and on March 6, 2000, United States District Judge C. Weston Houck, adopted the Magistrate Judge's recommendation. The defendants filed a motion to reconsider on March 20, 2000, which Judge Houck denied.

On March 7, 2000, the defendants filed a second motion for summary judgment. The plaintiff responded and filed a motion for appointment of counsel. On February 9, 2001, Judge Houck referred the defendants' second motion for summary judgment and the plaintiff's motion for appointment of counsel to the Magistrate Judge for consideration. On February 22, 2001, the Magistrate Judge filed a Report and Recommendation in which he recommended that the defendants' second motion for summary judgment be granted and the plaintiff's motion for appointment of counsel be denied as moot. The plaintiff filed objections to the Report on March 16, 2001.

2

On July 23, 2001, Judge Houck issued an Order statistically staying the plaintiff's motion for appointment of counsel and the defendants' second motion for summary judgment. The Order further required the defendants to file with the court, a report setting forth in quantitative terms, the results of a test and analysis of the air quality in Magnolia East, a building which is part of Kershaw Correctional Institution, in which plaintiff was being housed. Judge Houck's Order further directed that the report must specifically reference the levels of ETS found to be present in Magnolia East and directed that the report must be prepared by an expert qualified to perform such test. Further, Judge Houck ordered that the defendants provide a report by a physician who is a specialist in the area of asthma and/or respiratory disease, detailing the severity of potential harm caused by levels of ETS found in Magnolia East and the likelihood of such injury to the plaintiff, based upon his current medical condition. The physician was to be provided the results of the air quality test, the entire medical record of the plaintiff, and was granted the discretion of personally examining and testing the plaintiff as necessary. Finally, Judge Houck directed the defendants to provide a listing of all persons with whom the plaintiff had shared a cell while housed at Magnolia East, noting which of those persons were smokers, as well as the duration of each person's stay with the plaintiff.

In November, 2001, the plaintiff was transferred from Kershaw Correctional Institute to McCormick Correctional Institute. On or about March 21, 2002, the defendants provided Judge Houck with the requested analysis and medical report which are part of the record.

On October 7, 2003, the case was re-assigned from Judge Houck to United States District Judge Henry F. Floyd. On April 26, 2004, Judge Floyd held a pre-trial hearing in this matter. Judge Floyd inquired as to whether either side had any additional evidence to present prior to his ruling on the defendants' second motion for summary judgment. The defendants then filed one additional affidavit;

that of Warden Collie Rushton of McCormick Correctional Institution, where the plaintiff has been transferred. At the conclusion of the hearing, Judge Floyd announced that a decision would be rendered on the defendants' pending second motion for summary judgment within thirty (30) days. However, no order was issued.

On July 14, 2004, this case was transferred from Judge Floyd to the undersigned. On November 29, 2004, the undersigned granted the plaintiff's motion for appointment of counsel and also ordered mediation to be conducted. On December 6, 2004, the defendants filed a motion for reconsideration of the Order appointing counsel. On December 13, 2004, the undersigned denied the defendants' motion for reconsideration. On May 26, 2005, the court entertained oral arguments on the defendants' second motion for summary judgment. The court took the motion under advisement. On June 29, 2005, the undersigned granted in part, and denied in part, the defendants' second motion for summary judgment. For the sake of judicial economy, this court allowed the inclusion of, considered and addressed the plaintiff's similar allegations against McCormick Correctional Institute in that Order, although his original complaint did not reference McCormick since he was housed at Kershaw at the time it was filed.

With the consent of both parties, the remaining issues came before the court on September 26, 2005, and were tried, by agreement of the parties, before the court. During the one day bench trial, both the plaintiff and the defendants introduced without objection numerous documents obtained from the Department of Corrections' records. These documents included the above referenced air quality reports, the medical report of Robert L. Galphin, Jr., M.D., prison medical records and opinions demonstrating the frequency and nature of Tudor's medical requests and treatment, multiple grievance forms tendered by Tudor in his continuing complaints of ETS, affidavits from prison officials and inmates regarding

4

the existence of ETS in prison dormitories as well as their opinions on the HVAC-ventilation system, nine months of disciplinary records regarding inmate violations of the non-smoking policy at McCormick Correctional Institution, prison policies and memoranda, and inmate complaints. Moreover, the following witnesses testified during the trial: the plaintiff inmate Milo Tudor, inmate Greg Berry of the Trenton Correctional Institution (formerly housed at McCormick), Associate Warden Robin Chavis (a defendant), Associate Warden Stan Burtt (a defendant), and Warden Colie Rushton. At the conclusion of the plaintiff's case, the plaintiff voluntarily dismissed all defendants other than Rickie Harrison, the former warden at Kershaw who was warden during the time Tudor was housed in that institution.

Also, at the conclusion of the plaintiff's case, the defendants moved for judgment as a matter of law, which they termed as a directed verdict motion, and this court deferred ruling until the close of all evidence. Upon the close of all evidence, the remaining defendant renewed the motion and the same was taken under advisement. Upon due consideration, this court is of the opinion that judgment should be entered as set forth hereinbelow.

After reviewing all the documentary evidence and personally observing the witnesses called by the parties, this court has had an opportunity to consider the relevancy and weight of the evidence and to assess the demeanor of the witnesses. Prior to the trial, the parties on many occasions have briefed the relevant facts and issues presented by the case and have asserted their respective views of the appropriate legal doctrines governing the case. Based on all of the evidence, the testimony of the witnesses, and this court's review of the many documents introduced into evidence, this court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## Findings of Fact

1.     Plaintiff Milo Tudor is an inmate serving a lengthy sentence within the South Carolina Department of Corrections.  On September 17, 1997, Tudor was transferred to Kershaw Correctional Institute, a newly opened facility of the South Carolina Department of Corrections.

2.     In a health summary for classification/assignment on October 28, 1997, a prison physician, Dr. McKinney, noted that the plaintiff has asthma and indicated that he should not be exposed to environmental pollutants or allergens.

3.     In a memorandum dated December 16, 1997, Warden Rickie Harrison of the Kershaw Correctional Institute announced to all inmates that the prison would be setting up a non-smoking wing in the Magnolia Unit.  This unit became known as Magnolia East.  Warden Harrison indicated that any non-smoker who wished to be considered for transfer to this unit should submit a request to staff member form to an officer in Classification.  Warden Harrison also indicated that this wing would be for non-smokers only.   No tobacco (smoking) products to include lighters or matches would be permitted in that wing.  Additionally, Harrison indicated that "[i]nmates with medical situations such as **asthma** would be given first consideration for moving."  (Emphasis added).   Harrison further indicated that every effort will be made to continue to keep this wing a non-smoking wing and that disciplinary action would be taken against any inmate in the non-smoking wing who possesses tobacco (smoking) products.

4.     Plaintiff's prison medical records reflect that he made numerous complaints that exposure to second-hand smoke, environmental pollutants, and allergens exacerbated his asthmatic condition.  It appears undisputed that on December 23, 1997, Plaintiff was moved into Magnolia East based on his asthmatic condition.

6

5.     Shortly after the designation of Magnolia East as a non-smoking wing, Harrison effectively vitiated this development and his December 16, 1997, memorandum, by moving smokers into the unit. The defendants state that this was done because of an overcrowding problem at the prison.  In fact, there was testimony from the defendants at trial, that for an indefinite period of time, Kershaw was receiving over one hundred new prisoners a day and their main concern was not separating smokers from non-smokers, but rather instead, separating violent offenders from non-violent offenders.  This facility houses approximately 1,400 inmates.  In response to a complaint by Tudor, Harrison informed Tudor that he would try to remove the smokers from Magnolia East but that his first priority was finding beds for new inmates and, "[w]e do not know whether they are smokers or not. It is not a must that we attempt to maintain a non-smoking unit." Not a single defendant has offered any persuasive explanation why Harrison did not merely prohibit smoking in Magnolia East to the new inmates, especially since he had already declared that inmates with medical needs would be given priority there. There is no evidence that Harrison even considered the impact of ETS from the new inmates on those inmates with medical conditions such as Tudor.

6.     On July 9, 1998, nurse Shirley A. Taylor met with the plaintiff regarding his complaint of difficulty in breathing due to inmate smoking in a no-smoking dorm.  Nurse Taylor said that she "called and talked with dorm officer and she states yes the i/ms doe (sic) continue to smoke and she writes them up but nothing is done.  Officer Phillips.  I then called warden's office and talked with Ms. Sutters." According to Nurse Taylor, Ms. Sutters said that she would pass the information along to assistant warden Chavis.  As late as March 1, 2001, the plaintiff still complained at Kershaw about his medical condition, specifically stating that inmate James Wood, a smoker, was placed in his cell.  He requested that he be placed in a non-smoking cell.

7

7.      Dr. Blackwell, the SCDC's Medical Director gave an affidavit on February 12, 2000, which indicated that he is aware of the fact that Tudor is exposed to some degree of ETS through the ventilation system and possibly to some ETS from the common area of the living unit when his cell door is open.  He indicates Tudor is furnished a bronchial dialator for his asthmatic condition.  He indicates that Tudor's condition is not acute and barring some severe episode, will continue on a relatively mild course.  Dr. Blackwell further indicates that Tudor's housing at Kershaw does not constitute conditions posing a substantial risk of severe harm to his health.  He goes further and states that he believes that exposure to any ETS is harmful to some degree and that he personally believes all prisons should be entirely smoke-free.  Once again, this is the Medical Director of SCDC and the same doctor who ordered on the annual health summary for classification/assignment form on February 19,1999, that: Tudor had medical problems with work restrictions which were permanent; that he be assigned to a ground floor or bottom bunk; that he not be exposed to environmental pollutants, allergens, chemicals or other irritants; **and that he be assigned a no- smoking room**.  This is the first time the court observes in the plaintiff's medical records, where the defendants' own physician states that the plaintiff should be assigned a no-smoking room because of his asthmatic condition.  Certainly, Dr. Blackwell ordered these restrictions or requirements because he felt they were medically necessary for someone with Tudor's condition so that an exacerbation, however minor, could be avoided.  While Tudor appears not to have had a severe onset, he did testify as to his more frequent use of his inhaler whenever he felt the onset of a problem with his breathing beginning to occur, due to his inability to avoid the ETS.

8.      In 1997, Plaintiff's medical intake sheet had essentially the same restrictions noting his asthmatic condition except there was no mention of a "no-smoking room."

9.      On January 30, 1998, sick call notes indicate that Tudor states, "I need to be moved. I was in a no-smoking room, then they moved smokers back in and now I am using my inhalers . . .." On this date, the plaintiff was referred to an M.D. for breathing problems and asthma aggravated by smoke. The sick call records continue with regular prescriptions for Plaintiff's inhaler. On April 28, 1998, while he had a cold as well as asthma, there was another notation of "no exposure to smoke" by Dr. Blackwell.

10.     Inmate Derrick B. Smith signed an affidavit on February 19, 1999, stating that the plaintiff had been transferred into his cell and that he, Smith, was addicted to smoking and could not stop and that, while he was sensitive to the plaintiff's need to be away from ETS, he would "have to smoke in cell because that is the only area the South Carolina Department of Corrections, Kershaw officials authorized as a smoking area in the unit." There is also evidence that the canteen at Kershaw sold cigarettes and cigars to inmates in the non-smoking unit, i.e., Magnolia East.

11.     Dr. Robert Galphin, Jr., the pulmonary specialist who examined the plaintiff pursuant to the above referenced Order from Judge Houck, stated that the plaintiff may have reactive airways disease and has a history of asthma. Dr. Galphin explained that reactive airways disease is a condition where the individual develops sensitive airways and when exposed to certain strong or noxious substances such a cigarette smoke, fumes or odors, the person may develop an episode of bronchospasm. Dr. Galphin stated that this can be a condition which will progress if the individual continues to be exposed to these substances. Dr. Galphin recommended that Mr. Tudor be removed from areas where he would be exposed to strong or noxious odors, cigarette smoke, cleaning solutions, other smokes or dusts. Dr. Galphin found that at the time of this examination, no impairment or disability is noted. He further stated that Mr. Tudor has had asthma in the past and his current condition would not be caused by any

exposure he had experienced while in the South Carolina Department of Corrections but, instead, would be related to his previous history of asthma.

12.    Dr. Galphin also related in his report that Tudor indicates in the questionnaire he filled out that he has difficulty breathing when exposed to peanut butter. Galphin notes that peanuts, in particular, are known in some individuals to cause a very severe bronchospasm, which may result in death. He recommended, based on Tudor's complaint, that peanut butter and other peanut products be removed from Tudor's diet as much as possible.

13.    During the trial of this case, the defendants introduced into evidence a record of canteen purchases made by Plaintiff, covering a period of time beginning on June 16, 2004, and concluding on September 13, 2005, which reflects that the plaintiff, on a number of occasions, has purchased peanut products, including jars of peanut butter, M & M peanuts, Snickers bars, salted peanuts, Nutty Buddies and Reese's Peanut Butter Cups.  At trial, the defendants argued that such purchases raise the question of causation with regard to any asthmatic episodes experienced by Plaintiff.

14.    However, at trial, Plaintiff indicated that he did not react to food allergies.  Plaintiff testified that he only indicated to Dr. Galphin that other physicians in the past had informed him that peanut butter is known to cause problems with some individuals with asthma.

15.    After reviewing the report at issue and hearing the plaintiff's testimony in this regard, this court finds that the plaintiff's statement that peanut butter does not cause him to have asthmatic episodes credible.  Further, this court finds it incredible that the plaintiff would expend his limited financial resources on peanut butter and peanut products in order to purposefully onset asthmatic episodes.

16.    A review of the Medical Summary kept by the South Carolina Department of Corrections, Health Services, pertaining to the plaintiff, reflects that plaintiff periodically has prescriptions for an

Albuterol and Flovent Inhaler refilled.  Plaintiff testified at the trial that before he was transferred to Kershaw Correctional Institute he used one inhaler approximately every six months.  Since being at Kershaw and later McCormick, the plaintiff testified that he has had to use an inhaler much more frequently.  In fact, the plaintiff states that he had to start using a steroid inhaler, as well his normal one, and goes through both of those within one month.  It appears from the prison medical records which have been made part of the record that the plaintiff does get a new prescription for at least one inhaler approximately every month.  Specifically, a medical note from February 18, 1999, reflects a renewed prescription for Albuterol and the plaintiff is instructed to take two puffs, four times daily, and the one inhaler is to last for one month.

17.     At all times addressed in this action, the South Carolina Department of Corrections had in place written guidelines/policies establishing "smoking" and "non-smoking" areas of each facility operated by the Department, so that such institutions would be in compliance with the Clean Indoor Air Act of 1990 and all other applicable State and Federal statutes. This included both Kershaw and McCormick Correctional Institutions. Warden Burtt testified at trial that OSHA inspections had been made of the Kershaw Correctional Institution, with a finding that the institution was in compliance with OSHA's mandates.

18.     On September 30, 1997, Warden Harrison issue a memorandum to all inmates at Kershaw which stated that it has come to his attention that some inmates are smoking in non-designated smoking areas such as Day rooms.  Harrison further stated to inmates to please be advised that this is a reason to place a wing on restriction and effective immediately any indication of smoking taking place in a Day room will result in living area restrictions until such times as the violator is determined.  Harrison also stated that this is a violation of the Clean Air Act of 1990 which subjects you to a fine in addition to

11

appropriate disciplinary action which will be no less than 20 days or adjustment committee. However, the plaintiff testified that there was never any disciplinary action taken against violators of the no-smoking rules at Kershaw, and this court finds there was in fact little enforcement of those policies.

19.    In response to Judge Houck's Order, referenced above, the South Carolina Department of Corrections engaged the services of Mechanical Engineering Consulting Associates, Inc., to obtain an ETS readings in the Magnolia East housing unit. On September 20, 2001, Ron Sharpe, a Certified Industrial Hygienist, conducted air sampling for ETS and conducted air flow measurements. Air samples for ETS were taken in Cell # 6 (Tudor's cell), the Multi-Purpose room, and the Day room of Magnolia East (the latter two areas are designated as common areas in the facility). Ron Sharpe's report dated September 24, 2001, which was for his September 20, 2001, tests, indicates that the ETS air sampling reflected ETS readings that were within those permitted by all recognizable standards in the two common areas tested. However, Plaintiff's cell reflected ETS readings significantly higher than those permitted by all recognizable standards. Mr. Sharpe's September 24, 2001, report also indicates that air flow testing was conducted in six cells (cell numbers 3, 4, 6 (Tudor's cell), 7, 11, and 13) and the Multi-Purpose room on Magnolia East. Mr. Sharpe indicates in the report that it is their "understanding from Correctional facility personnel that inmates are only allowed to smoke inside cells or outside [the facility]. However, **inmates have been observed smoking in the Day and Multi-Purpose rooms in the facility**. The amount of fresh air per person (based on two inmates per cell) in Magnolia East meets the minimum ASHRAE criteria for sleeping areas, but not for smoking lounges. The amount of fresh air in the Multi-Purpose room meets the ASHRAE criteria for smoking lounges **only for a maximum occupancy for two inmates, which is impractical**." (Emphasis added).

20.    Shortly after the testing conducted on September 20, 2001, the plaintiff was transferred to

McCormick Correctional Institution, where he continues to be confined.  On January 9, 2002, another test was conducted by the same professionals, in Magnolia East.  This time only ETS air sampling was conducted.  Again, air samples for ETS were taken in Cell # 6 (Tudor's former cell), the Multi-Purpose room, and the Day room of Magnolia East.  The results of this test are provided in a report dated January 15, 2002, and show that Cell # 6 (Tudor's former cell), the Multi-Purpose room, and the Day room were found to have ETS levels within those permitted by all recognizable standards.

21.    While the defendants question the accuracy of the ETS level in Plaintiff's cell recorded by the test of September 20, 2001, and call it an aberration, which it may have been, they do not appear to contest the accuracy of the remaining test results which the court finds appear to be accurate.

22.    As to plaintiff's claims resulting while he was incarcerated at Kershaw and McCormick, this court finds that the plaintiff has presented sufficient evidence of his existing serious medical need.

23.    As to his housing at Kershaw and his claim against Warden Harrison, this court finds that the plaintiff has presented sufficient evidence of deliberate indifference on the part of Harrison.  However, this court finds that the plaintiff has failed to present sufficient evidence of deliberate indifference by anyone during his housing at McCormick and further, with regard to McCormick, the plaintiff has not named any individual defendant regarding his alleged claim arising out of his incarceration there.

24.    As to housing at Kershaw and his claim against Warden Harrison, this court finds that the plaintiff has failed to present sufficient evidence of conditions posing a substantial risk of serious future harm.

25.    The court finds the plaintiff has met his burden of proof with regard to the deliberate indifference to an existing serious medical need claim, while at Kershaw.

26.    The court finds the plaintiff has not met his burden of proof with regard to the deliberate

indifference to an existing serious medical need claim, while at McCormick.

27.     The court finds the plaintiff has not met his burden of proof with regard to the deliberate indifference to conditions posing a substantial risk of serious future harm claim, while at Kershaw.

28.     This court finds that the plaintiff's exposure to ETS while at Kershaw was the cause of his periodic exacerbated asthmatic condition and his testimony with regard to this was credible.

29.     This court finds that while the plaintiff was housed at Kershaw, he suffered some minor pain or discomfort, which is deemed by the court to be more than de minimis, as a result of the actions or inactions of Defendant Harrison.

### Conclusions of Law

In McIntyre v. Robinson, 126 F.Supp.2d  394, 400 (D. Maryland 2000), the district court found that:

> [w]ith regard to medical attention due a prisoner, prison officials can violate the Eighth Amendment in **two** ways.  The officials can be deliberately indifferent to the prisoner's **existing** serious medical needs, see  Estelle v. Gamble, 429 U.S. 97 (1976), or they can be deliberately indifferent to conditions posing a substantial risk of serious **future** harm. See  Helling v. McKinney, 509 U.S. 25 (1993).

(emphasis added).  In the complaint, the plaintiff makes allegations regarding both his present and future health.  As a consequence, this court must evaluate the plaintiff's claims in light of both any alleged existing serious medical need and any conditions posing a substantial risk of serious future harm that may arise as a result of his exposure to ETS (while at Kershaw).

*Substantial Risk Of Serious Future Harm While at Kershaw*

The court will first address the plaintiff's claim that prison officials have been deliberately indifferent to conditions posing a substantial risk of serious future harm.

In Helling, *supra*, the United States Supreme Court addressed this issue in the context of

14

prisoners and ETS conditions. The Court held that a prisoner states a cause of action under the Eighth Amendment by alleging that prison officials have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his *future* health. Id. at 35. Such a claim involves both objective and subjective components. The objective component requires that the inmate prove: (1) that he himself has been exposed to unreasonably high levels of second-hand smoke; and (2) that the exposure creates a risk of harm so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. Id. at 36.___ The subjective component requires proof that the defendants acted "with deliberate indifference" to the plaintiff's exposure to this risk. Id.

In this case, the court previously granted summary judgment to the defendants as to any possible claim against prisons officials at McCormick Correctional Institute being deliberately indifferent to conditions posing a substantial risk of serious future harm to plaintiff. This court noted the lack of any scientific or statistical evidence which shows that the plaintiff is being subjected to unreasonably high levels of ETS.

With regard to plaintiff's claim that prison officials at Kershaw Correctional Institute have been deliberately indifferent to conditions posing a substantial risk of serious future harm to him, this court concludes that the quantitative ETS measurements taken at Kershaw, as discussed above, demonstrate that ETS levels were within acceptable levels under all recognizable standards. Even if this court assumes that the levels were not within the recognizable standards, the plaintiff has still failed to show that any exposure created a risk of harm so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.

There is insufficient evidence that the level of ETS exposure, while housed at Kershaw, establishes any sort of basis for asserting that a substantial risk of serious future harm existed for the

plaintiff.  Likewise, the above referenced report by Dr. Galphin indicates that plaintiff has no impairment or disability.

Therefore, it is the conclusion of this court that the plaintiff fails to present sufficient evidence to satisfy his burden of proof as to the objective element of this claim and, therefore, this claim fails.

_Existing Serious Medical Need_

Existing serious medical need, in the context of an Eighth Amendment analysis, is comprised of two components, that are identified in the case law as the objective component and the subjective component.  The Fourth Circuit Court of Appeals stated in De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003) (quoting Hudson v. McMillian, 503 U.S. 1, 5 (1992)) that, "the showing necessary to demonstrate that particular conduct by prison officials is sufficiently serious to constitute cruel and unusual punishment 'varies according to the nature of the alleged constitutional violation.'" Consequently, the objective component requires an examination of the plaintiff's serious medical need.

A serious medical need was described by one district court as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious even a lay person would easily recognize the necessity for a doctor's attention."  Finlay v. Trent, 955 F. Supp. 642, 646 (N.D.W. Va. 1997).  In this case, Plaintiff must demonstrate by a preponderance of the evidence that he has a serious medical need to be free of ETS.  The subjective component requires that the Plaintiff must establish that the accused prison officials were deliberately indifferent to his serious medical need.  See Farmer v. Brennan, 511 U. S. 825, 837 (1994). Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 102-03 (1976).  This is true whether the indifference is manifested by prison doctors in response to the prisoner's needs or by prison guards in intentionally denying or delaying

16

access to medical care or intentionally interfering with treatment once prescribed. Id. at 104-05. Deliberate indifference exists when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

During the trial, there was much testimony about general smoking policies and issues within the Department of Corrections and its various institutions. Indeed, well before Tudor was incarcerated the Department seems to have adopted a policy allowing the designation of certain areas as non-smoking both with respect to staff and inmates. This policy even alluded to the Clean Indoor Air Act of 1990. The issue in this case is not, however, whether a general ban on smoking would have a salutary effect on the health of correctional officers and inmates, but whether this plaintiff had a serious medical need to be free of environmental tobacco smoke. Clearly, Tudor had a history of asthma and was found by at least two doctors to be in need of a smoke-free environment. Both doctors obviously opined that Tudor's medical condition could be seriously affected by exposure to ETS. There can be no question that the plaintiff has satisfied the objective aspect of the Eighth Amendment inquiry. He has an existing serious medical need. So the only question left is whether the prison officials' response to the medical need was deliberately indifferent.

The plaintiff has filed numerous grievances both at Kershaw and McCormick regarding his constant exposure to ETS. This has been well documented throughout the history of this case. The officials of the Department of Corrections cannot, therefore, assert that they are unaware of the plaintiff's medical condition, nor can they contend with any credibility that they are unaware of the plaintiff's continued complaints about his exposure to ETS. Plaintiff's complaints were of several

kinds. He complained that smokers were being placed in his cell, that the HVAC system at McCormick and Kershaw simply recirculated the air, including the cigarette smoke, and he complained about the non-enforcement of no-smoking policies in certain designated no-smoking areas. There is testimony and evidence from other inmates alleging the same occurrences.

The defendants offered testimony and evidence that in their subjective opinions the plaintiff was not exposed to "unreasonable" degrees of ETS, but there was no testimony from the defendants that Tudor was not exposed to ETS at all; so this testimony and evidence essentially creates a battle of opinions. Tudor and other inmates have claimed constant exposure to ETS with serious negative consequences, and the defendants have offered their opinions that the ETS levels were acceptable. There is no dispute at all, however, that Tudor continued to go to sick call with complaints of ETS exposure and its effect on his asthma, and it is uncontradicted that his use of bronchial dilators such as Albuterol went from occasional, prior to his incarceration, to virtually daily during his incarceration. These medical aids were prescribed by prison medical staff.

There was testimony that prison officials would from time to time conduct shakedowns, or unannounced random searches of cells to ferret out contraband such as weapons and other prohibited items. Tudor and Berry both testified that neither of them had ever seen a shakedown for tobacco products. Although the Warden at McCormick, Colie Rushton, testified that there were approximately twenty-six instances of inmates being disciplined at McCormick in 2005 for violating the no-smoking rules in McCormick's nonsmoking unit, F3, it appears from an examination of the documents he submitted that all such incidents involved inmates found to be in possession of smoking products or tobacco, or actually smoking, when interacting with correctional officers making rounds or merely being present. None of them were from shakedowns. Moreover, Warden Rushton testified that of the

18

twenty-six incidents, all but one appeared to result in the less punitive form of discipline, i.e., administrative discipline – and not formal discipline. The defendants offered no evidence of institutional discipline for smoking violations prior to 2005. As to Kershaw, Burtt did testify that he and Harrison would confront inmates when they saw them smoking, however, this does not appear to come close to the disciplinary action taken at McCormick.

Based on the evidence, it is reasonable to infer that the plaintiff was exposed to ETS from the time Warden Harrison rescinded the non-smoking policy for Magnolia East until the plaintiff was transferred to McCormick in 2001. Plaintiff has demonstrated by a preponderance of the evidence that his exposure to ETS was significantly worse than it was prior to his incarceration and that it caused him some physical pain, discomfort, and aggravated his pre-existing asthmatic condition which caused some increased use of an inhaler.

Apparently, the Kershaw officials did in fact determine that the existence of a medical condition could require an inmate to be placed in a totally smoke-free environment. Inmate Phillip Ward filed a grievance on November 7, 1997, and laid out a lengthy complaint regarding his constant exposure to cigarette and cigar smoke. He complained that he was a non-smoker and that the second-hand smoke irritated him and pointed out to the correctional officials that second-hand cigarette smoke could cause lung cancer and respiratory diseases. Correctional officials responded to the grievance by informing inmate Ward that he had no "medical condition, such as asthma or emphysema which would **require** placing you in a totally smoke-free environment." (Emphasis added). This clearly demonstrates that the correctional authorities were aware of the impact of ETS on certain medical conditions such as Tudor's asthma.

Although Harrison recognized the plaintiff's serious medical condition and has recognized the

19

adverse affects of ETS on inmates with medical conditions, and although he created a non-smoking unit ostensibly in recognition of this, he failed to maintain an effectively smoke-free environment in Magnolia East.  Simply counseling smokers in the non-smoking unit upon random interaction with them was not a reasonable effort to accommodate the need of Tudor and other inmates with medical conditions to be free of ETS.  There is no evidence that Kershaw officials conducted so-called "shakedowns," which are unannounced searches of inmates in their cells to identify and seize contraband (i.e., cigarettes, cigars, and other smoking related products) in designated no-smoking areas.

Deliberate indifference exists when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.  While the defendant argues that he was not deliberately indifferent because he provided the plaintiff with all of the inhalers and medicine he needed, no serious efforts were made by Harrison to protect Tudor from ETS, either in terms of keeping Tudor away from ETS or effectively disciplining inmates who smoked in the non-smoking areas.

One of the ironies in the testimony came from former Defendant Mr. Burtt, a former associate warden of operations at Kershaw.  He said the S.C. Department of Corrections had planned to introduce a totally no-smoking policy at all its institutions throughout the state, but abandoned the policy when it concluded that it would be confronted by an exodus of its smoking employees, as most of the Department's staff smoked according to Burtt.

As a result of Harrison's inaction and deliberate indifference at Kershaw, the plaintiff would feel the onset of asthmatic episodes and attacks, although minor, wherein he would have difficulty breathing, was required to use an inhaler more frequently, and was forced to live in an environment

20

which was both painful and uncomfortable. While Tudor may not have had a "severe" asthmatic attack which required being seen immediately by medical personnel, his use of the inhaler helped avoid a "severe" acute attack and he was required to use it with more frequently to avoid a "severe" asthmatic attack. That is exactly the purpose of an inhaler or bronchial dialator.

These episodes of difficulty in breathing increased with his inability to avoid ETS. Simply because they did not result in a "severe" attack (which was avoided by the use of an inhaler) does not negate the fact that some injury more than de minimis occurred periodically to Tudor.

With respect to Tudor's confinement at McCormick, he has not named any official from that institution as a defendant. If he had, I would be compelled to find, after hearing and weighing all the evidence, that the efforts of Warden Rushton, while perhaps lacking in aggressive punishment of the smokers in his no-smoking unit, were designed to make a good faith effort to effectively and permanently segregate smokers from the inmates housed in the no-smoking unit, which, of course, included the plaintiff and, therefore, was not deliberately indifferent.

Finally, it must be noted that the defendant has raised the defense of qualified immunity, which requires "(1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the [official's] position would have known that doing what he did would violate that right." Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992).

In a qualified immunity analysis, the court's first inquiry is "whether plaintiff's allegations, if true, establish a constitutional violation." Mellen v. Bunting, 327 F.3d 355, 365 (4th Cir. 2003) (citing Hope v. Pelzer, 536 U.S. 730, 736 (2002). As this court has found above that a constitutional violation existed, the court must now address whether at the time of the violation, the right was clearly

21

established.  The general right at issue was clearly established in the longstanding principle that an inmate may not be subjected by state actors to deliberate indifference to his existing serious medical needs.  See Estelle, 429 U.S. at 104.  Likewise, since at least 1993, when the United States Supreme Court decided Helling, supra, the right of an inmate not to be subjected to deliberate indifference to existing serious medical needs, in the context of exposure to ETS, was clearly established when that Court reaffirmed the holding in Estelle.[1]  However, the qualified immunity analysis must go farther, into the more fact-specific question of whether a reasonable person in the position of Harrison would have known, based upon the information he possessed at the time, that failure to put Tudor in a no-smoking room would violate that clearly established right.  See Beeson v. Johnson, 894 F.2d 401 (4th Cir. 1990). In this case, prison officials were without question made aware as early as February, 1999, by their own prison physician that because of Tudor's asthmatic condition he should not be exposed to smoke and should be placed in a no-smoking cell.  However, Tudor was continually exposed to ETS, housed with smoking cell-mates, made this exposure known to Harrison and other officials, and the defendant repeatedly failed to act to protect Tudor from ETS.  The court finds that a reasonable person should have known that the plaintiff's rights were being violated by his exposure to ETS after a prison physician stated he should not be exposed to smoke and given a no-smoking room.  For these reasons, this court holds that the defendant is not entitled to qualified immunity.

## Damages

Having met his burden of proof as to the existing serious medical need claim while at Kershaw

---

[1]  The Court went further to address and recognize the right of an inmate not to be subjected to deliberate indifference to conditions posing a substantial risk of serious future harm.  However, in this case, the court has found that the plaintiff has not met his burden of proof as to his claim that the defendants were deliberately indifferent to conditions posing a substantial risk of serious future harm.

involving Warden Harrison, the court concludes the plaintiff is entitled to some award of compensatory damages.  There is evidence in the record that the plaintiff has had some pain, discomfort, and exacerbation of his asthmatic condition requiring increased use of his inhaler.  However, while plaintiff's injuries were not de minimis, they were not extreme.  There has been no showing of a shortened life-span, permanent disability, or extreme discomfort.  While the plaintiff may have been exposed to ETS upon his initial arrival at Kershaw, the first prison physician's note which indicates he should be assigned a no-smoking room was in February, 1999.  Plaintiff was exposed to ETS at Kershaw after this February, 1999, physician's note date, until his transfer in November, 2001, – approximately thirty two months.  The plaintiff testified that most days he was not exposed to ETS during the daylight hours as he was at his job in the education building and only suffered from ETS in the late afternoon and evening hours, which required the use of his inhaler.  Therefore,  I hereby find and conclude that a reasonable sum to compensate the plaintiff is $100 a month, or $3,200, based on the February, 1999, date the prison physician indicated he should be assigned a no-smoking room until his transfer in November, 2001.

While the court recognizes the overcrowding and influx of new prisoners at Kershaw, the defendant had more than a year from the time Tudor came to the Kershaw facility until the prison's own prison physician said Tudor should be assigned a no-smoking room, to either adequately enforce the non-smoking policy or at least make an attempt to develop a screening process which would restrict placing smokers with nonsmokers who have a medical need, such as Tudor.  Even after the prison physician said Tudor should be placed in a no-smoking room, prison officials elected to do nothing as far as a screening process.  Likewise, their enforcement of the non-smoking policies was woefully inadequate.

Beginning an award of damages on the date the defendant's own prison doctor says Tudor should be placed in a no-smoking room, which is a total of approximately thirty two months rather than the full forty seven months of Tudor's time housed at Kershaw, gives the defendant the benefit of more than a reasonable time to take some action. Additionally, the prison physician's instructions were essentially ignored from that point on until Tudor was transferred to McCormick in November, 2001, even though this litigation was ongoing. The plaintiff has met his burden of proof and satisfied this court by a preponderance of the evidence of his entitlement to recover for the claim of deliberate indifference to his existing serious medical need while at Kershaw.

### Order

For the reasons stated above, this court hereby orders that judgment should be entered in favor of the defendant with regard to the plaintiff's claim of deliberate indifference to an existing serious medical need while at McCormick and plaintiff's claim of deliberate indifference to conditions posing a substantial risk of serious future harm while at Kershaw. Likewise, for the reasons stated above, this court hereby orders that judgment be entered in favor of the plaintiff and against the defendant for $3,200, with regard to the plaintiff's claim of deliberate indifference to an existing serious medical need while at Kershaw. To the extent that the plaintiff seeks an award of attorney's fees and costs, counsel is instructed to file an appropriate motion, accompanying memorandum, and affidavit in support thereof.

**AND IT IS SO ORDERED.**

s/ R.Bryan Harwell
R. Bryan Harwell
United States District Judge

October 5, 2005
Florence, South Carolina

24